Kevin **MULHERN**, Plaintiff,

v.

**EASTMAN KODAK COMPANY,**
Defendant.

No. 00–CV–6261 CJS.

United States District Court,
W.D. New York.

Jan. 25, 2002.

Charles W. Rogers, Mark Hannabury, Rochester, NY, for Plaintiff.

Todd R. Shinaman, Nixon Peabody LLP, Rochester, NY, for Defendant.

## DECISION AND ORDER

SIRAGUSA, District Judge.

This is an action alleging that defendants discriminated against the plaintiff in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and New York State Human Rights Law ("NYHRL"), N.Y. Executive Law § 290 *et seq.* Now before the Court is defendant's Motion for Summary Judgment [# 15]. For the reasons that follow, that motion is denied.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed. The plaintiff, Kevin Mulhern, was born with Nail–Patella Syndrome, " a rare inherited disorder ... characterized by abnormalities of bone, joints, fingernails and toenails, and kidneys." MERCK MANUAL OF DIAGNOSIS AND THERAPY, p.1907 (17th ed.1999). In 1979, plaintiff began working at the defendant, Eastman Kodak Company ("Kodak"), and in or about 1987, he transferred to the Production Flow Unit ("PFU") in the Color Film Manufacturing Department. For purposes of this motion, it is sufficient to note that the PFU included various separate areas of operation, including the 3R area, PRS area, 8 Room, Hopper Room, and Filter Manufacturing. The 3R area consisted of two main tasks, film rewind and film retest. (Mulhern Deposition, pp. 191–92). Workers in the 3R area were required to lift up to 40 pounds, push and pull carts weighing up to 1,500 pounds, lift, climb and stretch, and to walk and stand several hours per shift. (Id., p. 38). Workers in the PRS, on the other hand, were essentially bookkeepers, who had to use computers, sit, and walk. Employees required more training to work in the PRS than they did to work in 3R. (Scott Deposi-

tion, p. 45). The PRS section consisted of four separate tasks, a 3R coordinator, an off-line operator, an on-line operator, and an "SDC" operator.[1] (Mulhern Deposition, pp. 47–48, 59; Scott Deposition, p. 52).

Plaintiff began working in the 3R area, and eventually attained the position of lead operator on his shift, which position he held for approximately ten years. However, as a result of his Nail–Patella Syndrome, the work in the 3R area caused him to experience collapsing arches and severe pain in his back and legs. (Mulhern Deposition, pp. 39, 71). Nonetheless, he continued working in the 3R area until approximately 1996.

In 1996, plaintiff obtained a transfer to the PRS section of the PFU, because the work there was less physically demanding. (Mulhern Deposition, pp. 39–40). Plaintiff indicates that he had no problem performing the work in the PRS area. (Id., p. 59). As a result of working in both the 3R and PRS areas, plaintiff became the only employee in the PRS and 3R areas who was trained to perform all of the various tasks as to both assignments. Accordingly, although he worked primarily in the PRS section, plaintiff also occasionally worked in the 3R area when that area needed additional workers, however, he has indicated that, because of his physical ailments, he was "barely" able to perform the 3R work. (Id., pp. 46, 59).

In 1998, the defendant began implementing a policy, whereby separate work areas were to be combined into zones, and employees were to be cross-trained to perform the various tasks within the zone. Defendant indicates that, due to severe budget constraints and downsizing, it was necessary that employees be able to work flexibly between various tasks within a particular zone. Plaintiff agrees that this was the purported goal of the zone policy. (Mulhern Deposition, p. 59). Pursuant to this policy, the 3R and PRS areas were combined into one zone, meaning that PRS workers were expected to also work in the 3R area.

The extent to which workers had to rotate, however, is unclear, since there is no written job description pertaining to workers in the PRS/3R zone, and plaintiff's supervisors have provided differing explanations. For example, Marianne Valerio, plaintiff's zone leader, indicated that PRS/3R operators such as plaintiff had to be cross-trained in each position and able to perform each function. (Valerio Deposition, p. 25). Later, she indicated employees had to be able to perform some, but not all, of the tasks within the zone, and that there was no minimum number of tasks to be performed. (Id., pp. 49–50). Still later, however, she stated that, there was a minimum requirement, which was that an employee had to be able to perform both tasks in 3R, and only one task in PRS, the entry-level position of on-line operator. (Id., pp. 50–51). On the other hand, Ronald VanHarken, the Operations Director of the PFU and the most senior Kodak Supervisor deposed in this action, indicated that it was not a requirement that each employee of the PRS/3R zone perform all tasks, or even some tasks within both areas, but rather, that each particular shift be able to handle whatever situation might arise. In that regard, he indicated that each shift supervisor had to make a determination as to whether or not he had a sufficient number of employees to perform the tasks required during that shift. (VanHarken Deposition, pp. 80–81). VanHarken subsequently indicated that

---

**1.** The four PRS tasks were subsequently reduced to three when the SDC tasks were combined with the 3R coordinator tasks.

each employee had to at least have the ability to perform all of the tasks in a given zone, although he also acknowledged that not all employees in plaintiff's zone were trained to perform all of the various tasks. (*Id.*, pp. 101–104).

Plaintiff's supervisors also gave conflicting statements about whether or not employees' essential job functions were effected by their level of training. For example, Valerio indicated that, in 1998, not all PRS/3R zone employees actually worked at all of the various tasks within the zone, because they were not trained for the particular jobs. (Valerio Deposition, p. 45–46). However, she indicated that tasks for which employees were not trained were still essential functions of the job. (*Id.*, p. 46). On the other hand, John Scott testified that an employee's essential job functions were determined by his certification level. (Scott Deposition, p. 39). More specifically, Scott indicated, that as of 1998, it became an essential job requirement of all employees of both the PRS and 3R areas that they be able to work in both the PRS and 3R areas, however, not until they were trained: *"[A]s they received training, that they be able to work in both areas was an essential job function."* (*Id.*, p. 65)(emphasis added). In that regard, Scott testified that, if, in 1998, plaintiff had only been certified to work in PRS, he would have been able to perform the essential functions of his job. (*Id.*, pp. 49–50). Subsequently, however, he testified that an employee's essential job functions could include tasks for which he had not been trained. (*Id.*, pp. 100–02). In any event, the supervisors agree that employees were never told that they would be terminated if they were unable to rotate. (Valerio Deposition, p. 52; VanHarken Deposition, p. 121).

In June 1998, in response to the creation of the 3R/PRS zone, and due to his difficul-ty performing the heavy work in the 3R area, plaintiff obtained a "work prescription," because he wanted "protection from doing heavy work." (Mulhern Deposition, pp. 68–69). The work prescription required him to avoid bending, pushing, and pulling, and limited him to standing one hour per 8– or 12–hour shift, which prevented him from working in the 3R area, the 8 Room, and the Hopper Room, but did not affect his work in the PRS area. (*Id.*, pp. 69–71). At his deposition, plaintiff indicated that he was not aware of any accommodation that would have permitted him to work at any PFU job other than the PRS. (*Id.*, pp. 82, 112, 169–70). As a result, the only accommodation which plaintiff ever requested was that he be allowed to work exclusively in the PRS. (*Id.*, pp. 70, 82, 217).

Defendant's procedure regarding work prescriptions required the company's medical department to send an employee's work prescription to the employee's supervisor, who would then complete the form, indicating whether or not the employee could perform his job. If the employee needed an accommodation in order to perform his job, the supervisor would also complete a document entitled "Accommodation Request Documentation," explaining what type of accommodations were considered, and whether or not the accommodation would be appropriate and/or effective. (See, e.g., Shinaman Affidavit, Exhibit I). Upon receiving plaintiff's work prescription, plaintiff's supervisor, John Scott, wrote that, "Kevin will be assigned to his *primary task* in PRS which will not conflict with this [sic] restriction." (Rogers Affidavit, Exhibit A)(emphasis added). Scott indicated that, at that time, he did not believe it was an accommodation to allow plaintiff to work solely in PRS. (Scott Deposition, p. 36–37).

In August of 1998, defendant's medical department issued an updated work prescription, with essentially the same work restrictions, and Scott again indicated that he would assign plaintiff to the PRS. (Mulhern Deposition, p. 72). At that time, however, Scott indicated that he considered it an accommodation to allow plaintiff to work solely in the PRS. (Scott Deposition, pp. 36–37). For the rest of 1998, plaintiff worked exclusively in the PRS, except for 12 hours working in the 8 Room Hyper, a specialized task within the 8 Room that involved coating film. (Mulhern Deposition, p. 84).

In November of 1998, plaintiff informed the defendant's medical office that he would be having knee surgery in January 1999. Plaintiff indicates that at that time, a company medical nurse, Joyce Schwab, told him that if he returned from surgery with any kind of work restriction, "it would end badly" for him, and that she had seen it happen "too many times." (Mulhern Affidavit, ¶ 26). Subsequently, plaintiff asked John Scott about Schwab's comment, and Scott told him not to worry, and that he would be allowed to return to work exclusively in the PRS area after his surgery. (*Id.*, ¶ 27). However, plaintiff alleges that in December of 1998, Scott reversed his position, and told him that his assignment to the PRS could not exceed six months. Prior to that, Scott had never told plaintiff that the assignment to the PRS would be limited in duration. (Mulhern Deposition, p. 73). According to plaintiff, Scott said that Kodak's management had recently decided not to accommodate any medical restrictions beyond six months, and that plaintiff would therefore have to leave work on short-term disability. (*Id.*, pp. 73–75; Mulhern Affidavit, ¶ 28).

Scott denies telling this to plaintiff. (Scott Deposition, pp. 62–63). Rather, he indicates that, after accommodating plaintiff in the PRS for six months, he decided that the PFU could not continue to accommodate him, since he could not perform the essential functions of his job. (*Id.*, pp. 86–87). More specifically, Scott concluded that it was an essential function of plaintiff's job to be able to perform tasks within the 3R. (*Id.*, pp. 68, 99–100). On the Accommodation Request Documentation form that he completed on December 7, 1998, Scott wrote that continuing to allow plaintiff to work in the PRS would not be an effective or appropriate accommodation, because, "[j]ob flexibility between PRS and 3R rewinder/retest is critical to department performance (overtime reduction, cycle time)." (Shinaman Affidavit, Exhibit I). Accordingly, Scott forced plaintiff to leave work and go on short-term disability, although he did permit plaintiff to remain in the PRS an additional two weeks, to coincide with his leaving work on January 23, 1999, to have knee surgery. (Scott Deposition, p. 75).

As a result of his surgery, plaintiff was unable to perform any work until April of 1999. (Mulhern Deposition, p. 89). On April 5, 1999, he went to the defendant's medical office and obtained a new work prescription, which prohibited bending, standing more than one hour per day, climbing, and "stooping or other associations." (Rogers Affidavit, Exhibit M). Although the prescription did not mention pushing and pulling, plaintiff admits that he could not perform the pushing and pulling required in the 3R. (Mulhern Deposition, pp. 69–71, 82, 100, 103–06). However, even with those restrictions, he was able to perform all of the PRS functions.

The work prescription was sent to Richard Spalty, the new PFU supervisor who had replaced John Scott, who did not know plaintiff, and who was not familiar with his work history.(Rogers Affidavit, Exhibit D, p. 32). The work prescription listed plain-

tiff's job functions as follows: "lift 40 [lbs.], push/pull up to 1500 lb, bend, stoop, walk, 12 hour shift." (Shinaman Affidavit, Exhibit N). On April 9, 1999, Spalty wrote on the work prescription form: "Due to the restrictions listed, we are unable to accommodate Kevin Mulhern in any of the operations areas that report to me. This is based upon the essential job functions on file with HR." (*Id.*). Spalty further indicated that allowing plaintiff to remain in the PRS was not an appropriate accommodation, because: "Job flexibility and rotation is critical to department performance to cover all areas, on any shift, with no overtime and to improve cycle time. *Even the Production Recorder Office [PRS] requires frequent standing and walking that far exceeds the 1 hour limitation during a 12 hour shift.*" (Rogers Affidavit, Exhibit F)(emphasis added).

As a result of Spalty's decision, plaintiff was not permitted to return to work in the PRS, and he remained out of work on temporary disability during all of 1999, during which time his physical condition did not improve. (Mulhern Deposition, p. 106). During that period, plaintiff looked for other positions within Eastman Kodak, using a computerized job listing maintained by the company known as "EK Jobs," which listed approximately 99 percent of the available jobs within Kodak. (Mulhern Deposition, p. 86; Noble Deposition, pp. 20–21). The other one percent of jobs not posted on EK Jobs were posted internally to departments of divisions which sought candidates from within. (Noble Deposition, p. 21). Plaintiff checked the listing about once a month, but did not find any jobs for which he was qualified. (*Id.*, p. 87). Plaintiff did not apply for any jobs within Eastman Kodak, nor did he apply for any job outside of Eastman Kodak. (*Id.*, pp. 87, 109). Spalty also looked for suitable jobs for plaintiff within Eastman Kodak, but found none. (Mulhern Deposition, pp. 82–83).

At some point during 1999, while plaintiff was out of work, defendant abolished the PRS/3R zone, and began permitting employees to rotate to various other positions both in and out of the PFU. Plaintiff alleges that this change was made because certain 3R employees did not have the aptitude for the PRS tasks. Plaintiff contends that he was never told about this change, and that he learned about it on his own through reviewing company records. Spalty admits that he abolished the 3R/PRS zone, and permitted employees of either the PRS or 3R to rotate to other areas of the PFU, such as the 8 Room or the Hopper Room. (Spalty Deposition, p. 69). However, he maintains that employees still had to rotate, and that the expansion of the zone did not benefit plaintiff, since he could not work in the 8 Room or the Hopper Room.

However, plaintiff indicates that he could have rotated into the Hyper Wash portion of the 8 Room (Mulhern Affidavit, ¶ 42), and John Scott admitted that, even with his restrictions, plaintiff was able to work in the 8 Room Hyper as a second operator. However, Scott contends that was not feasible, because Hyper was not a "regular job," as it only took place from three to five times a year and lasted between 16 and 30 hours. (Scott Deposition, pp. 58, 101). However, the Accommodation Request form which Spalty completed in May 1999, denying plaintiff's request to return to work, does appear to indicate that Hyper was a "regular job":

PFU is responsible to provide coverage for several functional areas. *These areas are* [PRS](Bookkeepers), 3R Rewinder, 8 Room, *Hypering*, Pump Room, and Coating Equipment. Operators work rotating shifts and provide 24 hour a day, seven day a week coverage to production. *Operators are required to be multi-tasking and multi-functional*

*and must be able to rotate through at least two areas.*

(Rogers Affidavit, Exhibit F, p. EKC 301)(emphasis added).

Plaintiff also contends that a PFU employee named Sam Brown, who had physical limitations similar to his, had been allowed to work exclusively in another area known as "Flat Filters" during 1999 (Mulhern Affidavit, ¶ 38), and that he too could have worked in the Flat Filters area. Defendant, however, maintains that plaintiff was not physically capable of working in the Flat Filters area, because such work required lifting up to 40 pounds and required employees to be on their feet "nearly the entire day." (Matusz Response Affidavit, Exhibit D, VanHarken Deposition, pp. 41–42). VanHarken further indicated that there were no job openings in Filter Manufacturing. (*Id.*).

Plaintiff also alleges that defendant permitted one PRS operator, Rebecca Lyman, to rotate out of the PFU altogether to its State Street Office, while he was never given that opportunity. (Mulhern Affidavit, ¶ ¶ 43–44). He further alleges that some employees were permitted to work exclusively in the PRS. (Mulhern Deposition, pp. 124, 133, 142–45). Plaintiff indicates that not all employees in the PRS/3R zone were required to work in the 3R area, although he does not know their names. (Mulhern Deposition, p. 123). Defendant, however, maintains that all employees did in fact rotate.

On November 3, 1999, while plaintiff was still out on short-term disability, his orthopedic surgeon, Dr. Kunze, wrote to defendant's medical department, and stated:

> It is my opinion that this patient will not be able to return to his previous occupation which requires pushing 3,000 to 4,000 pounds of material on rollers, which he has to do, not just because of the problem with weakness in the left leg, but also problems involving his right

knee. He certainly will have the restriction of lifting no more than about 100 pounds and pushing no more than 300 to 400 pounds on a dolly or some kind of mobile support structure.

(Kunze Affidavit, Exhibit B). On December 1, 1999, Dr. Kunze sent a follow-up letter, in which he indicated his belief that plaintiff was a candidate for a modified work assignment, consisting of sedentary work, "with the ability to rise and walk around intermittently." (Kunze Affidavit, Exhibit C). Dr. Kunze further noted that plaintiff "should be prevented from any heavy lifting ... [and] should not be required to climb up and down ladders or scaffolds and certainly should not push any heavy loads as before." (*Id.*).

In response to Dr. Kunze's reports, on December 9, 1999, defendant's medical office prepared a final work prescription, which indicated, "[e]mployee needs mostly sedentary work with ability to change posture as needed," and "avoid heavy lifting-none over 20 lbs," and which also prohibited pushing and pulling "heavy loads" and "climb[ing] up and down ladders or scaffolds." (Rogers Affidavit, Exhibit N). The company nurse who completed the prescription indicates that she reduced plaintiff's lifting ability from 100 pounds to 20 pounds, as a result of a subsequent phone conference with Dr. Kunze or someone at his office, however, Dr. Kunze denies that he ever had such a discussion. Although the company nurse claims that she sent this final work prescription to plaintiff's new supervisor, David Betlam, there is no indication in the record that Betlam completed the Accommodation Request paperwork and returned it to the medical department. (Welch Deposition, pp. 71–72, 79–80).

In January 2000, defendant terminated plaintiff's employment.

Prior to his termination, and in anticipation of his one year of short-term disability benefits ending in January 2000, plaintiff applied for long-term disability benefits. (Shinaman Affidavit, Exhibit Q). Plaintiff described his medical condition as follows:

Hereditary Oncho–Osteo Dysplasia (Nail Patella Syndrome) collapsing/rolling feet, lower back pain, migraines, anxiety/depression, left knee cap removed, right pending, numbness left leg. Left knee and foot give out on occasion due to 'stabbing' pains and weakness. Unable to sleep normally due to pains in L arm, back, knees + feet. 3–4 hrs max.

(Shinaman Affidavit, Exhibit Q). Further as part of the application for benefits, plaintiff was asked, "Do you expect to return to your last occupation either on a full or part-time basis?," to which he responded:

I am no longer able to do physical work as required by my employer, so I would have to say no to this. *It also seems unlikely I could have a 'sit down' job because of the pain associated with that, mainly knees + feet + back. Need freedom to move + rub when necessary.*

(Shinaman Affidavit, Exhibit Q, ¶ 8)(emphasis added). He was then asked, "Do you expect to return to some *other* type of occupation either on a full or part-time basis?," to which he responded, "No. I have done jobs which require physical mobility and mine has become limited. *Due to movement restrictions and pain coupled with inability to sleep I can't think of any possible job I could do.*" (*Id.*, ¶ 9)(emphasis added).

On January 22, 2000, defendant's long-term disability insurer denied plaintiff's application, and, on April 17, 2000, plaintiff appealed. (Mulhern Deposition, p. 135; Shinaman Affidavit, Exhibit Q). In his appeal, plaintiff wrote that, in addition to his other physical problems, he suffered from "[l]ack of sleep-anxiety," and asked,

"How can you expect someone to work on 4 hours sleep a night and be tired all day. My current day consists of a[sic] least 1[-] 3 hour nap so I can get a reasonable amount of sleep. Would an employer allow this?" (Shinaman Affidavit, Exhibit Q). The insurer denied plaintiff's appeal.

At his deposition, plaintiff indicated that when he stated, on the disability application, that he could not think of any job he could do, he meant that there was no job at Kodak he could perform: "Because I was told by Kodak that there was no job that I could do. This was Kodak's insurance company, so I was telling them what they were telling me." (Mulhern Deposition, pp. 118–19; see also p. 134). Plaintiff maintained, however, that even with the problems he listed, he remained able to perform the PRS tasks. (*Id.*, p. 121). He further explained this apparent inconsistency in the following manner:

Q. If the pain coupled with the inability to sleep made you think there was no possible you could do, how did you think you could do the PRS job?

A. Because I had done the PRS job for years and I knew I could do those jobs.

(*Id.*). Later during the deposition, however, when asked about his appeal of the denial of long-term benefits, plaintiff testified as follows:

Q. Well look at ... your appeal. In the middle of the page, right under "This alone should suffice," you indicate here, "Lack of sleep, anxiety as Dr. Dennis calls it. How can you expect someone to work on four hours' sleep a night and be tired all day? My current day consists of at least one three-hour nap so I can get a reasonable amount of sleep." Aren't you indicating here that, in fact, you didn't think you could get any job, you could [sic] work in any job at that time?

A. Yes.

(Mulhern Deposition, p. 137).

On May 12, 1999, plaintiff filed a charge of discrimination with the EEOC, alleging, in relevant part:

> I am no longer able to perform all the duties of a Production Service Worker position. The respondent had previously accommodated me for six months in a Bookkeeper position. On April 6, 1999, I requested a reasonable accommodation of either job restructuring in the Product Service Worker position or a permanent reassignment to Bookkeeping. The Respondent denied my request and will not allow me to return to work unless I have no restrictions.

(Shinaman Affidavit, Exhibit O). The EEOC issued plaintiff a Right to Sue Letter on March 16, 2000.

Plaintiff commenced this action on June 8, 2000. Following discovery, defendant filed the subject motion for summary judgment. Defendant concedes that plaintiff is disabled, for purposes of the ADA, but contends that it is entitled to summary judgment for several reasons. First, Defendant alleges that plaintiff could not perform the essential functions of his job, because he could not work in the 3R. (Defendant's Memo of Law, p. 4). Accordingly, defendant contends that plaintiff's requested accommodation, that he be allowed to work solely in the PRS, was not reasonable, because it would have eliminated an essential function of his job. Defendant also contends that there was no reasonable accommodation which it could make to allow plaintiff to work in the 3R. In addition, defendant maintains that it was not required to transfer plaintiff to another position, because there were no such openings. Finally, defendant argues that plaintiff's case should be dismissed because, by his own admissions, made in support of his application for disability benefits, he is completely incapable of performing any work.

In opposition to the motion, plaintiff contends that the ability to work in 3R was not an essential function of his job. In this regard, he contends that many PFU employees were not trained to rotate into other positions, and that, in fact, many employees rarely rotated. For example, defendant's records for 1999 appear to indicate that at least two other employees worked in only one area of the PFU: C. Brodie and T. Hohman worked only in Filter Manufacturing. (Shinaman Affidavit, Exhibit K). Defendant's records further indicate that, in 1999, R. Courtney worked outside of the PRS only 53 hours, R. Courtright worked outside of the PRS only 148 hours, Rebecca Lyman worked outside of the PRS only 18 hours, and S. Patmon worked outside of his primary assignment in the 10 Stock Room for only 8 hours. (*Id.*): Moreover, Courtright, who in 2000 worked outside of the PRS only 60 hours, testified that one only needed to work outside of one's primary assignment for "a fairly limited amount of time" in order to satisfy the rotation requirement. (Courtright Deposition, pp. 26, 36).

Plaintiff further alleges that the consequences of his not rotating would not have been severe. For example, although Spalty insists that plaintiff's inability to rotate could have possibly resulted in the PFU unit shutting down, he admits that he never considered the actual cost, if any, to the company, including the cost of possible overtime, of allowing plaintiff to work solely in the PRS. (Spalty Deposition, pp. 61–62, 72, 75). Instead, plaintiff contends that his ability to perform all of the tasks in the PRS area was more beneficial to the defendant than having him rotate to 3R. (Mulhern Affidavit, p. 48). He states:

> There always has to be at least one, and usually two, operators in the PRS area.

The inability to staff the PRS area is more likely to cause a product flow disruption because of a manpower shortage than is the ability to staff the 3R area. An examination of the documents Kodak provided showing the total number of hours worked in each area clearly shows this to be so. In 1998, for example the total number of man hours required in the various PRS jobs in the bookkeeper area was 26,000 hours. The total number of hours required in the 3R Area was one-half that amount. (13,055 hours).

(Mulhern Affidavit, ¶ 49). He further notes that Marianne Valerio agreed that his ability to work in all areas of the PRS had a benefit to the company in terms of flexibility that could have counterbalanced his inability to work in the 3R. (Valerio Deposition, p. 56).

In any event, plaintiff alleges that his firing was not because he could not rotate to the 3R, but instead, was because Richard Spalty mistakenly believed that plaintiff could not perform even the PRS tasks. (Plaintiff's Memo of Law, p. 3). In support of this argument, plaintiff cites Valerio's deposition, in which she testified that Spalty told her that plaintiff could not perform the PRS tasks. (Valerio Deposition, pp. 56–57). Plaintiff also relies upon the Accommodation Request form which Spalty completed, in which he indicated that plaintiff could not work in the PRS, because, "[e]ven the [PRS] requires frequent standing and walking that far exceeds the 1 hour limitation during a 12 hour shift." Spalty, admitted that he did not know that plaintiff was able to perform all of the PRS tasks. (Spalty Deposition, p. 76). Moreover, he admitted that he was not aware the plaintiff had been working strictly with the PRS prior to his surgery, and that he was "surprised" to later discover that fact. (Rogers Affidavit, Exhibit D, pp. 62–63).

Plaintiff also contends that defendant did not make a reasonable attempt to accommodate him. For example, he claims that defendant could have accommodated him by using "mechanized dollies in the 3R area," but that it did not, because it incorrectly believed that he had a restriction on the amount of time he could stand. (Plaintiff's Memo of Law, p. 26). Plaintiff also argues that defendant did not make diligent efforts to help him find another job within the company, and he suggests that EK Jobs did not have a complete listing of positions within Kodak.

Finally, plaintiff maintains that he is not estopped from pursuing an ADA claim because of his statements made in support of his application for long-term disability benefits, because, despite his statements, he was still able to perform the PRS job.

Counsel for both parties appeared before the undersigned for oral argument on December 20, 2001. The Court has thoroughly considered the parties' submissions and the arguments of counsel.

## ANALYSIS

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender

3d ed.). Once that burden has been established, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

■ Moreover, "[i]n moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied*, 517 U.S. 1190, 116 S.Ct. 1678, 134 L.Ed.2d 780 (1996).

■ Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted). However, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985),

*cert. den.* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74.

■ The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993). However, the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) (citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987) (citations omitted).

■ At the outset, the Court notes that, applying this foregoing principle of law, certain evidence which plaintiff has presented must be disregarded. First is plaintiff's claim that defendant could have accommodated him by using mechanical dollies in the 3R. The Court views this contention as nothing more than an attempt by plaintiff to seize upon an apparent omission by defendant's medical department to include a limitation on his ability to stand in his final work prescription. (See, Defendant's Memo of Law, pp. 26–27). Regardless of why the final work prescription did not contain a limitation on standing, plaintiff's April 1999 work prescription did contain such a limitation, and plaintiff testified at his deposition that his condition had not improved during 1999,

and had actually worsened. (Mulhern Deposition, p. 106; *see also*, Plaintiff's Application for Long-term Disability Benefits, Shinaman Affidavit, Exhibit Q: "Extended time on my feet results in intense pain in feet/knees and back for days."). Moreover, plaintiff indicated that 3R work required "lots of walking and standing." (Mulhern Deposition, p. 38). Accordingly, it is clear that plaintiff could not stand for long periods, and therefore he could not have worked in 3R even using mechanical dollies. Additionally, the Court will disregard plaintiff's claim, in his affidavit in opposition to the motion, that Spalty made derogatory comments to him regarding his disability, since, at his deposition, he testified that the only person who ever made such a comment was his co-worker, Keith Zemaitis. (*Id.*, pp. 140–41).

■ The Court will now examine the merits of defendant's motion. The elements of a prima facie case under the Americans with Disabilities Act are as follows:

> To establish a prima facie case of discriminatory discharge under the ADA, an employee bears the burden of demonstrating that: 1) he was an "individual who has a disability" within the meaning of the statute; 2) the employer had notice of his disability; 3) he could perform the essential functions of the job with reasonable accommodation; and 4) the employer refused to make such accommodation. *See Stone v. City of Mount Vernon*, 118 F.3d 92, 96–97 (2d Cir. 1997), *cert. denied*, 522 U.S. 1112, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998). We have ruled that failure to make reasonable accommodation, when the employee has satisfied the first three elements of his claim, amounts to discharge "because of" his disability. *See, e.g., Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir.1998). If the plaintiff succeeds in establishing a prima facie case of

disability discrimination, the burden shifts to the employer to demonstrate that the employee's proposed accommodation would have resulted in undue hardship. *See Stone*, 118 F.3d at 97. *Parker v. Columbia Pictures Industries*, 204 F.3d 326, 332 (2d Cir.2000). The same analysis is used for claims under the New York State Human Rights Law. *Id.*, 332 n. 1

■ Defendant contends that plaintiff cannot establish the third element of his prima facie case, because he was not able to perform the essential functions of his job, i.e., he was not able to rotate to 3R, and because his requested accommodation was not reasonable, since it would have eliminated that essential function. In *Stone v. City of City of Mount Vernon*, the Second Circuit Court of Appeals set forth the relevant law on essential job functions as follows:

> The term "essential functions," which is not defined in the statutes themselves, is generally defined in ADA regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") to mean the "fundamental" duties to be performed in the position in question, but not functions that are merely "marginal," 29 C.F.R. § 1630.2(n)(1) (1996). The regulations also provide illustrations of the reasons that a given function may be found to be fundamental to the position and examples of evidence that may be considered in making that finding: Essential functions—(1) In general. The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.
> (2) A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of. incumbents in similar jobs.

29 C.F.R. § 1630.2(n). Plainly, the considerations set out in this regulation are fact-intensive. Usually no one listed factor will be dispositive, and the regulations themselves state that the evidentiary examples provided are not meant to be exhaustive.

*Stone*, 118 F.3d at 97.

In *Stone*, a fire department employee who suffered a spinal injury, and who was therefore unable to actively fight fires, requested that he be transferred to one of two light-duty bureaus within the fire department, the "FAB," wherein the job duties included "receiving and transmitting of alarms of fires, answering telephones,

and performing related paperwork, or the "FPB," wherein job duties included enforcing the New York State fire and building code, reviewing architectural plans, meeting with builders, and inspecting buildings." *Id.* at 93. It was undisputed that the plaintiff could have performed those duties, however, the fire department declined to make that accommodation, arguing that, because of budget constraints against hiring additional employees, all firefighters, regardless of their bureau, were required to be able and ready to perform fire-suppression duties. The department further alleged that a reduction in the number of employees able to actually fight fires "would be unnecessarily dangerous." *Id.* at 94. The plaintiff claimed that the ability to fight fires was not an essential function of the FPB job, as shown by the fact that certain employees had worked in that bureau for decades without ever having to fight a fire. Further, he produced evidence that the fire department needed his assistance in the FAB, but declined to place him there, out of fear that "such an assignment might in the future required the Department either to hire persons who were not as well qualified as [the plaintiff] or to overload [the bureau] with disabled individuals." *Id.* at 95. In reversing the trial court's grant of summary judgment for the defendant, the Second Circuit considered the factors set forth in 29 C.F.R. § 1630.2(n), and concluded that the trial court had given too much weight to the defendant's judgment as to which functions were essential. As to that, the Court noted that there were no job descriptions or collective bargaining agreements indicating that FAB or FPB workers had to actually fight fires, and that, "as a matter of practice, firefighters assigned to FAB or FPB simply have not been called upon to fight fires." *Id.* at 99–100. As a result, the Court determined that there was an issue of fact as to wheth-

er or not the ability to fight fires was an essential function of the plaintiff's job.

Another case relevant to this issue is *Kiphart v. Saturn Corporation,* 251 F.3d 573 (6th Cir.2001). There, the defendant claimed that it was an essential function of the plaintiff's job as an automobile production worker to be able to rotate between various tasks within a production group, which the plaintiff was unable to do. The plaintiff, however, introduced evidence that, in practice, all employees did not rotate, and that "both Saturn and UAW supervisors knew team employees were not fully rotating among job tasks and that no employees had been disciplined for non-rotation." *Id.* at 576. Further, the plaintiff showed that the collective bargaining agreement between the defendant and plaintiff's union did not require task rotation. *Id.* In considering the case, the Sixth Circuit Court of Appeals noted, first, that "the determination of whether a given function is 'essential' within the meaning of the ADA and regulations promulgated thereunder is typically a question of fact and thus not suitable for resolution through a motion for judgment as a matter of law." *Id.* at 585 (citation omitted). The Court then noted, "the evidence presented suggests that ... the only time Saturn fully implemented its job rotation concept was when it placed employees with *medical* restrictions. Then, and only then, did it require applicants for permanent openings to be fully functional/fully rotational." *Id.* at 585. The Court therefore found that a reasonable jury could conclude that the ability to rotate was not an essential function of the plaintiff's job. *Id.*

Applying these principles of law to the facts of this case, the Court finds that plaintiff has raised a triable issue of fact as to whether or not it was an essential job requirement that he rotate to 3R. First, there is no written job description or collective bargaining agreement requiring rotation. Moreover, despite the allegedly mandatory rotation requirement, defendant never told its employees, other than plaintiff, that they would be terminated if they could not rotate. Rather, as in the *Kiphart* case, there is some evidence that Kodak may have only used the rotation rule to terminate employees with a disability, such as plaintiff. Moreover, plaintiff has produced evidence that defendant knew that certain employees were not able to rotate, because they lacked training. In addition, even if all other employees did rotate, some only rotated out of their primary assignments for very limited amounts of time.

Plaintiff has also come forward with evidence suggesting that his ability to perform all of the tasks within PRS was actually more beneficial to the defendant than having him rotate to 3R. Finally, although defendant claims that allowing plaintiff to remain in PRS could have harmed the company, it is undisputed that no one at Kodak actually determined what effect, if any, such an accommodation would have had. Accordingly, the Court finds that there are triable issues as to whether or not plaintiff could perform the essential functions of his job with or without accommodation.

 Even assuming that it was an essential function of his job to work in at least two areas, as defendant maintains,[2] there is an issue of fact as to whether or not plaintiff satisfied that requirement, since, as defendant admits, he was able to work in both the PRS and the 8 Room Hyper Wash. John Scott opined that Hyper was not a "regular job" for rotation purposes, however, as noted above, Rich-

---

**2.** "Kodak's requirement is that Product Flow Unit employees have the ability to flex between a minimum of two positions in the department as needed." Defendant's Reply Memo of Law, p. 3.

ard Spalty indicated otherwise, and listed Hyper as one of the "areas" to which an employee could rotate. (*See,* Rogers Affidavit, Exhibit F, p. EKC 301). This fact, along with Spalty's admitted ignorance of plaintiff's actual work abilities, including his ability to work in PRS, and presumably, his ability to work in Hyper, further calls into question Spalty's determination that plaintiff was unable to perform his job with or without reasonable accommodation. As to that, it is worth reiterating that the decision not to accommodate plaintiff was made by Spalty, a new supervisor who knew nothing about plaintiff, except what little information appeared on the work prescription form.

■ The Court will now consider whether or not plaintiff's statements made in connection with his application for long-term disability benefits bar him from pursuing his claims. In *Cleveland v. Policy Management Sys. Corp.,* 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999), the U.S. Supreme Court considered whether or not a plaintiff who claimed to be disabled in applying for Social Security Disability benefits was precluded from thereafter pursuing an action under the ADA. In that case, the plaintiff had indicated on her application for disability benefits that she was "disabled" and "unable to work." *Id.* at 1600. The Court characterized these statements as "legal conclusions," and found that such statements do not, as a matter of law, preclude a claim under the ADA, noting that, "an ADA suit claiming that the plaintiff can perform her job *with* reasonable accommodation may well prove consistent with an SSDI claim that the plaintiff could not perform her own job (or other jobs) *without it."* *Id.* at 1602. However, the Court indicated that, in order to survive summary judgment in such a situation, the plaintiff must provide a "sufficient explanation" for the apparent conflict. *Id.* at 1603. The Court stated: "To defeat summary judgment, that explanation must

be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.' " *Id.* at 1604. Moreover, the Court made it clear that its holding did not apply to "directly conflicting statements about purely factual matters." *Id.* at 1601.

Similarly, in *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1 (2d Cir.1999), the Second Circuit considered the effect of a plaintiff's statements to the New York Worker's Compensation Board and the United States Social Security Administration on his subsequent ADA lawsuit. There, the plaintiff had indicated in the prior proceedings that he was "totally disabled" and unable to walk or stand for long periods, and needed to work in a "sedentary position." *Id.* at 4–7. Later, in connection with his ADA lawsuit, the plaintiff indicated that he could walk and stand for several hours at a time. *Id.* at 4–5. The District Court held that the plaintiff "was estopped from asserting as a factual matter, that he was capable of performing work in other than a sedentary position." The Second Circuit affirmed, on grounds of "judicial estoppel," finding that the plaintiff had asserted a factual position in a prior legal proceeding which had been accepted by the earlier tribunals. *Id.* at 7.

Subsequently, in *Parker v. Columbia Pictures Indus.,* 204 F.3d 326 (2d Cir. 2000), the Second Circuit considered, *inter alia,* the effect of a plaintiff's statements to his employer's long-term disability benefits insurer on his later ADA claim. There, the plaintiff had told the insurer that he was "completely incapacitated—disabled—treatment daily." *Id.* at 334. The Court first reiterated that summary judgment may be appropriate where a plaintiff has "offered purely factual statements that directly contradict[ ] one another and [can-

not] be reconciled with any amount of explanation." *Id.* at 334. However, it found that plaintiff's statement to the insurer did not require summary judgment, noting, a "representation of total disability differs from a purely factual statement in that it often implies a context-related legal conclusion." *Id.* Moreover, the Court found that the plaintiff's explanation, i.e., "that ... his medical need for continued physical therapy entitled him to long-term disability benefits *once he was being denied the opportunity to work,* notwithstanding that he felt able to endure the pain and discomfort involved in getting to his former place of employment and was desirous of doing so," could persuade a reasonable juror that he was able to perform his job with reasonable accommodation. *Id.* at 335–36.

In light of these holdings, the Court finds, on the basis of the explanation which he gave above, that plaintiff's statements in support of his initial application for disability benefits do not prevent him from pursuing his ADA claim. Although on the application he claimed to suffer from specific physical ailments, such as pain and inability to sleep, at his deposition, he indicated that he was still able to do the PRS tasks, and that he only sought disability benefits because defendant would not permit him to continue in that position. Accordingly, with regard to his original application for long-term disability benefits, which he filed in November 1999, prior to his termination, the Court finds that plaintiff has provided an explanation which, as in the *Parker* case, could arguably cause a reasonable juror to conclude that, despite those ailments, he was able to perform his job with reasonable accommodation.

On the other hand, plaintiff's appeal of the insurer's decision, made in April 2000, several months after his termination, appears to be irreconcilable with an ability to perform his job, even with reasonable accommodation. That is, plaintiff stated that he needed to take a 3–hour nap in the middle of the day, when his job, at the very least, required him to work a 12–hour shift. Moreover, at his deposition, plaintiff indicated that when he stated that he needed to take a nap during the day, he meant that he could not do any job. (Mulhern Deposition, p. 137). However, plaintiff did not write that appeal letter until several months after he was terminated, and he stated therein only that his "current day" included a 3–hour nap. (Shinaman Affidavit, Exhibit Q). Accordingly, the Court declines to find, as a matter of law, that plaintiff was unable to perform the PRS tasks at the time he was terminated. *See, DiSanto v. McGraw–Hill, Inc. /Platt's Division,* 220 F.3d 61, 65 (2d Cir.2000)(Noting that plaintiff's statement, made after his termination, that he was "not well enough to work *at present,*" would not necessarily prevent a reasonable jury from finding that he was able to work at the time of his termination.)

## CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment is denied in its entirety.[3]

So ordered.

---

**3.** In addition to moving against plaintiff's claims under the ADA and New York Human Rights Law, defendant also sought summary judgment on plaintiff's claim under the Family and Medical Leave Act, on the grounds that plaintiff had no right to return to his job, since he was unable to perform that job. However, for the same reasons stated above, the Court finds that there are triable issues of fact as to the Family and Medical Leave Act claim.